1

2

3

4

5 UNITED STATES DISTRICT COURT

6 NORTHERN DISTRICT OF CALIFORNIA

7

8 JEFFERY ROWE,                                          No. C 08-2317 SI (pr)

9          Plaintiff,                          **ORDER GRANTING MOTION FOR
                                                SUMMARY JUDGMENT**
10     v.

11 DR. Z. AHMED,

12          Defendant.

13 _____/

14                              **INTRODUCTION**

15          In this action, Jeffery Rowe complains about the medical care he received when he was

16 incarcerated at the Correctional Training Facility in Soledad, California. For the reasons

17 discussed below, defendant's motion for summary judgment will be granted and judgment will

18 be entered against plaintiff.

19

20                              **BACKGROUND**

21          In his unverified second amended complaint, Rowe alleged that he had back surgery in

22 2000, including a "cage and fusion" of part of his spine that entailed placement of about six

23 surgical screws and other hardware in his spinal column. He further alleged that he stepped into

24 a pothole at the prison in February 2007 and hurt his back. He further alleged that he saw

25 medical staff on February 25, 2007, who did not take his complaints of pain seriously enough

26 and prescribed naproxen. He also alleged he saw Dr. Ahmed for his back pain on August 8,

27 2007, and told Dr. Ahmed that he thought the hardware in his back had moved when he stepped

28 into the pothole. Over the next several months Dr. Ahmed provided care that Rowe alleged was

inadequate.  The court earlier determined that the second amended complaint stated a § 1983 claim against Dr. Ahmed for an Eighth Amendment violation based on the alleged deliberate indifference to Rowe's medical needs.

The following facts are undisputed unless otherwise noted.

At the relevant times in 2007-2008, Rowe was a prisoner and Dr. Ahmed was a doctor at the Correctional Training Facility ("CTF") in Soledad.

Rowe now has, and has had, "severe and chronic back pain."  Rowe Decl., ¶ 3.

On January 11, 2007, Rowe submitted a written request for medical services for back pain.

Rowe tripped in a pothole in February 2007.

Rowe received medical attention in the months before he had any contact with defendant Dr. Ahmed.  On February 26, 2007, Rowe saw medical personnel[1] and complained about back pain.  He was prescribed naproxen, a pain medication.  On March 8, 2007, Rowe was cleared by medical personnel for a possible out-of-state transfer.  The parties disagree whether he stated he had no medical issues when interviewed for the transfer.  On May 1, 2007, he was prescribed pain medication for 30 days.  On June 13, 2007, Rowe saw medical personnel, requested more pain medication for his ongoing "back problem," and was again prescribed pain medication.  On July 8, 2007, Rowe filled out a health care service request form about back pain and wrote that naproxen did not relieve his pain.  He submitted a second request on July 23, 2007, and a third request on August 2, 2007.  On August 2, 2007, Rowe was prescribed two pain relievers and told to return if his symptoms persisted or worsened.

Dr. Ahmed (the only defendant) first saw Rowe on August 8, 2007.  Rowe told Dr. Ahmed he earlier had surgery and thought a screw might have come loose in his back, and requested narcotic pain relievers.  In Dr. Ahmed's professional opinion, it was not appropriate to prescribe the narcotics Rowe requested.  Dr. Ahmed noted that Rowe had been on pain

---

[1]Rowe saw several different health care providers at the prison.  Only Dr. Ahmed is a defendant in this action.  The court does not identify the health care provider by name when it was someone at the prison other than Dr. Ahmed, because the identities of the particular actors other than Dr. Ahmed do not matter in this action against him.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

relievers for quite some time and formed the opinion that Rowe's pain was chronic. Dr. Ahmed's written orders requested an x-ray of Rowe's spine and a neurosurgery consultation with Dr. Ramberg. Dr. Ahmed prescribed Motrin and Neurontin for pain relief.

On August 22, 2007, Rowe saw medical staff for a follow-up. A surgical report from his 2000 surgery was requested and Tylenol #3 (a narcotic pain reliever) was prescribed.

On August 23, 2007, Rowe had a complete lumbar spine series of x-rays. The radiologist's report stated that the surgical "fusion appears to be stable on these images" and there was "[n]o evidence for hardware failure." Exh. ZA046. Dr. Ahmed informed Rowe of this result in a written "notification of diagnostic test results" form. Exh. ZA047.

On September 7, 2007, Tylenol #3 was prescribed again after Rowe filled out health care service request forms on September 4 and 6, 2007. The earlier prescription expired on September 6, according to Rowe's request form. Exh. ZA173.

Dr. Ahmed saw Rowe on September 11, 2007, and told Rowe he would renew the medication until Rowe had a consultation with a neurosurgeon. Dr. Ahmed renewed prescriptions for Tylenol #3, Neurontin, and Motrin. Dr. Ahmed noted that Rowe was very rude, aggressive and manipulative in behavior.

Dr. Ramberg, a neurosurgeon in private practice, saw Rowe on September 18, 2007. Dr. Ramberg requested an MRI of the lumbar spine, which Dr. Ahmed ordered the next day.

Dr. Ahmed saw Rowe on October 10, 2007. He ordered a refill of all of Rowe's medications, including Tylenol #3, Neurontin and Motrin for pain. Dr. Ahmed also requested another consultation with the neurosurgeon.

On November 5, 2007, Rowe had a lumbar spine MRI. The radiologist's report for that MRI noted "mild degenerative changes" and stated that, "[a]t L4-L5 and L5-S1 there appears to be a stable pedicle screw fixation as well as interbody fusion with some type of cage graft noted at L5-S1 levels." ZA048. The plate and screw fixation "appears to be stable." Id. On November 14, 2007, Dr. Ahmed informed Rowe of these normal results.

On November 7, 2007, Rowe's medications, including three pain medications, were renewed.

On November 14, 2007, Rowe had a CT-scan of his lumbar spine. The radiologist's

report of the CT-scan stated the appearance was "stable without evidence of hardware fracture." There were "[n]o unusual postoperative findings in a patient with L4-S1 posterolateral effusion and interbody strut grafts at L4-5 and L5-S1." ZA052.

On November 15, 2007, Rowe saw Dr. Ahmed for a medication renewal. Rowe told Dr. Ahmed that the MRI and CT-scan had been done. Dr. Ahmed renewed his Tylenol #3 prescription for 30 days.

On November 30, 2007, Rowe's Neurontin and Motrin prescriptions were renewed.

On December 13, 2007, Dr. Ahmed saw Rowe, renewed his Tylenol #3 prescription, and requested the follow-up with Dr. Ramberg be expedited.

On January 7, 2008, Dr. Ahmed saw Rowe, noted that they were still waiting for a follow-up appointment with Dr. Ramberg, and renewed his Tylenol #3 prescription.

On January 18, 2008, medical staff saw Rowe.

On January 28, 2008 and again on February 26, 2008, Dr. Ahmed renewed Rowe's medications, including Tylenol #3.

Dr. Ramberg saw Rowe for a follow-up appointment on March 11, 2008 regarding the MRI and CT-scan. Dr. Ramberg scheduled Rowe for surgery to take place in about a month. Dr. Ramberg recommended MS Contin, another narcotic pain reliever. MS Contin was not ordered at that time, but Tylenol #3, gabapentin (i.e., Neurontin), and ibuprofen (i.e., Motrin) were ordered by Dr. Ahmed.

On March 26, 2008, Rowe told Dr. Ahmed that Tylenol #3 was not controlling his pain. Dr. Ahmed then prescribed MS Contin, a narcotic pain medication for Rowe.

On April 9, 2008, Rowe was seen by medical personnel. It was noted that Dr. Ramberg needed the CT-scan results. Medical staff noted that Rowe's gait appeared normal and that he did not grimace.

On April 17, 2008, medical staff saw Rowe and noted that he seemed "at ease," walked well and did not grimace or show pain. Exh. ZA202.

On April 24, 2008, Dr. Ahmed renewed Rowe's pain medications, including MS Contin.

On May 6, 2008, Rowe was seen by medical personnel, who noted that Rowe looked "at

*United States District Court*
For the Northern District of California

ease" and his posture was erect.  His attitude was noted as unhappy, aggressive and demanding.  Dr. Ahmed renewed Rowe's pain medications that day.

Dr. Ramberg operated on Rowe in May 2008.  Dr. Ramberg's written surgical reports show that three different procedures were done.  The first surgery, on May 12, 2008, was described as: "Inspection of lumbar fusion.  Removal and testing of previously placed pedicle screw instrumentation.  Repair of dural abnormality."  Exh. ZA086.  The description of the procedure mentioned that a "slit in the dura was noted" but does not state whether that situation arose before or during the surgery.  Id.  The second surgery, on May 19, 2008, was described as: "Reopening lumbar incision, repair of cerebrospinal fluid leak with 4-0 silk sutures and fibrin glue."  Exh. ZA085.  The third surgery, on May 27, 2008, was described as: "Suture repair of dural tear, laminectomy, redo, sealing dural tear with Duraseal glue, placement of cerebrospinal fluid drain."  Exh. ZA084.

On June 11, 2008, Dr. Ahmed saw Rowe and noted that he was healing well from surgery.

Dr. Ahmed summarized his activities:

I received and evaluated all X-Ray, MRI and CT reports.  The findings in these reports, as well as plaintiff's physical demeanor indicated there was no need for emergency medical care.  I relied on the normal findings in these reports and still referred plaintiff to Dr. Ramberg, an outside neurosurgical specialist, for additional treatment.  When there was a delay in having him seen by Dr. Ramberg. I renewed my referral and requested that it be expedited. [¶] The symptoms of the problem plaintiff experienced, cerebralspinal fluid leakage, are headache and abnormal gait.  Plaintiff showed none of these symptoms and it is unknown when this condition arose.

Ahmed Decl., ¶¶ 45-46.  Dr. Ahmed opined that Rowe was given the appropriate medications for pain by the prison doctors, and that Rowe's medical condition was "treated with an appropriate amount of treatment and care, and in a manner that was reasonably timely and consistent with the knowledge and skill ordinarily possessed by members of [the] profession under similar circumstances."  Id. at ¶¶ 47-48.

/  /  /

/  /  /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to Rowe's complaint occurred at a prison in Monterey County, located in the Northern District.  <u>See</u> 28 U.S.C. §§ 84, 1391(b).  This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983.  <u>See</u> 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Generally, as is the situation with Dr. Ahmed's challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Celotex</u>, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  <u>See</u> <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with

28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, the second amended complaint was not verified, and therefore is not considered as evidence for purposes of deciding the motion. Plaintiff's declaration in opposition to the motion is considered, however.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. Id. at 631.

**DISCUSSION**

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference necessitates examining "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id. (quoting Estelle, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health. See Farmer, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn"

1   that an excessive risk of harm exists, and he or she must actually draw that inference.  Id.  A

2   mere difference of opinion as to which medically acceptable course of treatment should be

3   followed does not establish deliberate indifference.  See Sanchez v. Vild, 891 F.2d 240, 242 (9th

4   Cir. 1989).  Where doctors have chosen one course of action and a prisoner-plaintiff contends

5   that they should have chosen another course of action, the plaintiff "must show that the course

6   of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the

7   plaintiff must show that they chose this course in conscious disregard of an excessive risk to

8   plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.), cert. denied, 519 U.S. 1029

9   (1996) (internal citations omitted).

10          Where, as with Rowe's allegations that Dr. Ahmed delayed access to some medications

11   and the neurosurgeon, there was some response but the complaint is about the timeliness of that

12   response to the medical condition, the temporal component is best considered as part of the

13   subjective prong rather than the objective prong of the deliberate indifference test.  See, e.g.,

14   Plemmons v. Roberts, 439 F.3d 818, 823-24 (8th Cir. 2006) (response to complaints of heart

15   attack symptoms).  The need for speed goes to whether the official took the "reasonable

16   measures" mentioned in Farmer, 511 U.S. at 837.  It is not the law that anything other than

17   instantaneous response to any medical complaint is an Eighth Amendment violation, as both

18   incarcerated and unincarcerated people must endure some waiting time for almost any medical

19   care, whether it be a few hours in an emergency room or weeks or months for a doctor

20   appointment. Although the response time and the quality of the response fit under the subjective

21   prong, the objective condition also must be properly identified to determine the reasonableness

22   of the response; here, it makes a difference if the objective condition is defined as a screw

23   pushing into the spinal column causing cerebral spinal fluid to leak that threatens paralysis, see

24   Second Amended Complaint, pp. 6, 8, or back pain when one examines the reasonableness of

25   the response.  (For example, while both high blood pressure and heart attacks are serious, the

26   need for immediate medical attention to the latter is far greater and a response time of one month

27   might be acceptable for high blood pressure but wholly unacceptable for a heart attack.)  The

28   Eighth Amendment analysis in a delayed response case requires a plaintiff to prove (or, at the

United States District Court
For the Northern District of California

1    summary judgment stage, to raise a triable issue of fact) that a delay occurred to an inmate with

2    a problem so severe that a delay would cause significant harm and that the defendant knew this

3    to be the case.  Cf. Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002).

4

5    A.    Serious Medical Need?

6          The Eighth Amendment claim requires that there be an objectively serious medical need.

7    The evidence in the record shows that Rowe complained of severe and chronic back pain.  The

8    evidence suffices to raise a triable issue of fact as to the existence of severe and chronic back

9    pain that amounts to an objectively serious medical need.

10         Rowe does not, however, provide sufficient evidence to allow a reasonable jury to find

11   that he suffered a punctured dura when he tripped in a pothole in February 2007, or that the

12   hardware in his back moved out of place that day, or that the cerebral spinal fluid leak ("CSF

13   leak") started that day.  Rowe states that his "condition required Dr. Ramberg to remove the

14   existing hardware [he] had in [his] back and the repair of [his] dura due to it being punctured by

15   a screw when [he stepped] in a pothole."  Rowe Decl., ¶ 12.  Rowe does not raise a triable issue

16   of fact with his statements as to the cause of his back pain because he does not present any

17   evidence that he has the requisite medical expertise to opine that the hardware had shifted,

18   punctured his dura or caused a CSF leak that day.  His statements as to the cause are pure

19   speculation and, as such, cannot defeat defendant's motion for summary judgment.  He might

20   argue that his back did not hurt until he slipped and fell, but that would not establish his point

21   because (a) he complained of back pain weeks before the slip-and-fall, see Exh. ZA154, and (b)

22   even if he can pinpoint when the pain began, he does not have the medical expertise to explain

23   what occurred inside his body to cause that pain.  The radiologists' reports on the imaging tests

24   done showed that the hardware was intact and did not note that the hardware appeared to have

25   moved.  Also, the evidence is undisputed that the symptoms of a CSF leak are headaches and

26   an impaired gait – neither of which were mentioned in any of Rowe's requests for medical

27   services or inmate appeals before his surgeries and neither of which are mentioned as patient

28   complaints in the medical records before his surgeries in May 2008.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10

Rowe argues that Dr. Ramberg confirmed his belief that the hardware in his back had moved and had to be removed.  Opposition, p. 6.  Dr. Ramberg's written reports do not state this. In a report dated March 11, 2008, Dr. Ramberg wrote that the MRI showed "the previous fusion area looking good, though there is considerable artifact at the level of both fusions at the L3-4 level and there is some beginning stenosis mostly from posterior facet hypertrophy."  Exh. ZA122.  Dr. Ramberg further wrote: "I have two recommendations: )1) He would get some help from being placed on MS Contin 15 mg b.i.d., and in addition 2) I think he would be a candidate for inspection of his lumbar fusion with removal of the previously placed instrumentation and re-fusion if necessary."  Exh. ZA122.   Dr. Ramberg's March report also did not mention a puncture of the dura or a CSF leak or any headache complaints.

11
12
13
14
15
16
17

Although Rowe does not show a triable issue of fact that he had a punctured dura, hardware displacement, or a CSF leak starting when he tripped in the pothole, he did not need to show any of those situations to meet his burden on the objective prong of the Eighth Amendment analysis because the evidence of his severe and chronic back pain is enough to show an objectively serious medical need.  The identification of the serious medical need as severe and chronic back pain rather than these other conditions is of significance in that it informs the analysis of the deliberate indifference prong of the Eighth Amendment analysis.

18
19

B.    Deliberate Indifference?

20
21
22
23
24
25
26

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).  Leer explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages."  Id.  In the former case, a broader and more generalized approach to causation is taken.  Id.

27
28

When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined.  We must focus on whether the

10

United States District Court
For the Northern District of California

individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference.  In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant…Sweeping conclusory allegations will not suffice to prevent summary judgment…The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

Id. at 633-34 (citations omitted) (emphasis added).  Dr. Ahmed thus would not have exposure for every shortcoming in the medical department at CTF, but only if he personally was deliberately indifferent.

Defendant has met his burden on summary judgment of showing the absence of evidence that he acted with the deliberate indifference necessary for an Eighth Amendment claim.  Even viewing the evidence in the light most favorable to Rowe (as the non-movant), no reasonable juror could conclude that Dr. Ahmed knew that Rowe faced a substantial risk of serious harm and disregarded it.

Rowe was seen by some medical care provider – a doctor, physician's assistant or nurse – eighteen times in ten months regarding his back pain.  Dr. Ahmed and other medical care providers prescribed pain medications and regularly renewed those medications (except for a single 1- or 3-day period when a prescription expired before being renewed, as discussed below).  The pain medications were supplemented with stronger pain relievers when the need arose.  Dr. Ahmed also referred Rowe to an outside neurosurgeon for additional care.  And Dr. Ahmed ordered the diagnostic x-rays, MRI and CT-scan, all of which showed essentially normal results for a person with hardware in his back.

Rowe disputes several factual assertions made by Dr. Ahmed, but none of his disputes show a triable issue of material facts.  He states that Dr. Ahmed "is taking credit for medical care he never provided.  Dr. Mendez provided most of the care that defendant refused to provide or provided in a manner that was sub-standard."  Rowe Decl., ¶ 5.  This does not raise a triable issue of fact, because (1) Rowe does not identify the particular care Dr. Ahmed allegedly improperly claimed credit for, and (2) regardless of who provided it, the assertion shows that care was provided.  Rowe credits Dr. Mendez for ordering x-rays and putting him on Tylenol #3 on August 22, 2007, but the medical records show that Dr. Ahmed issued those orders on

United States District Court
For the Northern District of California

August 8, 2007.  Exh. ZA0006 (8/8/07 physician's order for x-ray LS spine, UMC neurology consult, Neurontin, Motrin, and a follow-up in 2 weeks); see also Exh. ZA046 (x-ray report listing requesting physician as Dr. Ahmed).

Rowe asserts that Dr. Ahmed let his pain medication run out for three days between September 4, 2007 and September 7, 2007.  Rowe Decl., ¶ 9.  Although he now states it was three days, the records indicate it may only have been one day: in his health care request, Rowe wrote that his prescription expired on September 6, 2007, Exh. ZA 173, and a health care provider other than Dr. Ahmed ordered the medication on September 7, 2007.  Exh. ZA008.  Regardless of whether he was without pain medication for one or three days, Rowe presents no evidence to show that it was Dr. Ahmed who was the cause of this brief interruption in his pain medication.

Rowe states that, every time his pain medications needed to be renewed, "it took an inmate appeal or some other sort of intervention to keep the medications coming."  Rowe Decl., ¶ 10.  Rowe's written requests were made as he neared the end of prescription periods and not after the prescription periods expired.  See Rowe Decl., Exh. A.  That a patient may have been an extremely persistent advocate to avoid a lapse in medical care does not show or support an inference that he did not receive medical care.

Rowe also states that Dr. Ahmed never updated or gave him medicine "without hesitation or reluctance."  Id. at ¶ 13.  That a doctor may have been a reluctant provider of drugs does not show a failure to provide medical care.  The patient is entitled to medical care, but legally it matters not whether it is service with a smile or service with a snarl.

Rowe contends that Dr. Ahmed modified other doctors' orders to change "T.I.D." to "B.I.D." (i.e., reducing the dosage of a medicine from three times to two times per day).  Opposition, p. 1, p. 4.  Even if one assumes that someone altered a medication order – which is far from clear – there is absolutely no evidence that Dr. Ahmed did it.  Rowe's speculation simply does not show a triable issue of fact.  He also contends that someone altered one of Dr. Ramberg's reports, but the alteration – whoever did it – does not make any difference to the

United States District Court
For the Northern District of California

1   present dispute because it is not about Rowe's lower back.[2]  And, as with alleged alteration of

2   the medication orders, there is absolutely no evidence that Dr. Ahmed did it.

3        Dr. Ahmed did not follow one of the specialist's recommendations, but this does not raise

4   a triable issue of fact that he acted with deliberate indifference.  On March 11, 2008,

5   neurosurgeon Dr. Ramberg recommended MS Contin, a narcotic pain medication, for Rowe.

6   ZA122.  Dr. Ahmed's notes of his telephone conversation that date with Dr. Ramberg recite that

7   Dr. Ramberg wanted to schedule Rowe for surgery and said "to continue pain meds up to that

8   time (he said anything is OK for him, though wrote MS [illegible]."  Exh. ZA 192.  Dr. Ahmed

9   renewed Rowe's pain medications, including Tylenol #3, but did not at that time order MS

10  Contin.  Dr. Ahmed next saw Rowe on March 26, 2008 and ordered MS Contin when Rowe told

11  him that Tylenol #3 was not controlling his pain.  On the evidence that Dr. Ahmed prescribed

12  three pain medications (i.e., Tylenol #3, Neurontin, and Motrin), and ordered that a follow-up

13  be scheduled with Dr. Ramberg for surgery, no reasonable trier of fact could find that Dr.

14  Ahmed acted with deliberate indifference in not also ordering the narcotic pain reliever MS

15  Contin on March 11, 2008.  Rowe has not shown that the course of action Dr. Ahmed chose was

16  medically unacceptable under the circumstances and chosen in conscious disregard of an

17  excessive risk to his health.  See Jackson, 90 F.3d at 332.

18       When the evidence is viewed in the light most favorable to Rowe, and inferences

19  therefrom drawn in his favor, no reasonable jury could return a verdict for him and against

20  defendant Dr. Ahmed.  Dr. Ahmed is entitled to judgment as a matter of law on the Eighth

21  Amendment claim.

22

23

24  _____

25       [2]The alleged alteration in Dr. Ramberg's report was the replacement of the word "pathology" with a blank line.  The sentence "He has continued to have pathology investigated

26  in the thoracic spine secondary to thoracic degenerative disk disease" appears on what Rowe dubs the "real original" but reads "He has continued to have _____ investigated in the

27  thoracic spine secondary to thoracic degenerative disk disease" on what he dubs the "altered original placed in file by CTF."  See Rowe Decl., Exh. C.  As noted elsewhere, Rowe's

28  complaints about back pain pertain to low back pain where he had the fusion, rather than the thoracic area of his spine.  The report also was written after the surgeries on his lumbar spine fusion site.

**CONCLUSION**

For the foregoing reasons, Dr. Ahmed's motion for summary judgment is GRANTED. (Docket # 16.)  Dr. Ahmed is entitled to judgment as a matter of law on the merits of the Eighth Amendment claim.

Rowe's motion for default judgment is DENIED because Dr. Ahmed was not in default at the time the motion was filed.  (Docket # 15.)

Judgment will be entered in all defendants' favor and against plaintiff.  The clerk will close the file.

Dated: June 23, 2009

SUSAN ILLSTON
United States District Judge

14